# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
In re                          :

:

THE RUGGED BEAR COMPANY,    :     Chapter 11
f/d/b/a RB ACQUISITION CORP.,    :

:     Case No. 11-10577-HJB

Debtor                 :

:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF THE DEBTOR FOR AN ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF ITS ASSETS FREE AND CLEAR OF ANY AND ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS; (II) APPROVING FORM OF AGENCY AGREEMENT; (III) APPROVING BID PROCEDURES AND BREAKUP FEE; (IV) SCHEDULING AN AUCTION AND SALE HEARING; (V) APPROVING FORM AND MANNER OF NOTICE; (VI) SHORTENING NOTICE PURSUANT TO RULE 9006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; AND (VII) GRANTING RELATED RELIEF AND REQUEST FOR SCHEDULING OF EMERGENCY HEARING ON BID PROCEDURES ORDER**

The Rugged Bear Company f/d/b/a RB Acquisition Corp. ("Rugged Bear" or the "Debtor") hereby submits this motion (the "Motion") for an order, pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") and Rules 2002(a)(2), 6004(f)(1), and 9006(c)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (a) authorizing the Debtor to (i) sell substantially all of its assets free and clear of any and all liens, claims, encumbrances, and interests and (ii) conduct inventory liquidation sales ("Inventory Sales") at the Debtor's retail store locations (collectively, the "Stores"); (b) approving the form of Agency Agreement by and between the Debtor and Gordon Brothers Retail Partners, LLC ("Gordon Brothers" or the "Agent"), a copy of which is attached hereto as Exhibit A, subject to higher or better offers; (c) establishing certain bid procedures (the "Bidding Procedures") to select higher or better offers to conduct the Inventory Sales and to

solicit offers to separately purchase the Debtor's intellectual property and any other assets so

designated (collectively, the "Intellectual Property"); (d) approving the payment of a breakup fee

to the Agent; (e) scheduling (i) an auction (the "Auction") determine the highest and best offer to

conduct the Inventory Sales and to purchase the Intellectual Property and (ii) a hearing (the "Sale

Hearing") to consider this Motion and entry of an order approving the sale(s) contemplated

hereby (the "Sale Order");[1] (f) approving the form and manner of notice pursuant to Rule

2002(a)(2); (g) shortening the notice period required by Rule 9006(c)(1) to the extent necessary

for the Inventory Sales to commence at the Stores no later than March 1, 2011; and (h)

scheduling an emergency hearing to consider this Motion with respect to entry of an order

establishing the Bid Procedures and scheduling the Auction and Sale Hearing (the "Bid

Procedures Order"), a copy of which is attached hereto as Exhibit B pursuant to Massachusetts

Local Bankruptcy Rule ("MLBR") 9013-1(g)(1)(A).  **The Debtor respectfully requests that**

**the Court schedule an emergency hearing to consider entry of the Bid Procedures Order at**

**10:00 a.m. on February 15, 2011, at which time the Court will hear other matters in this**

**chapter 11 case.  TD Bank, N.A. ("TD Bank"), the Official Committee of Unsecured**

**Creditors (the "Committee"), and the Office of the United States Trustee (the "U.S.**

**Trustee") have consented to having the hearing on entry of the Bid Procedures Order at**

**that date and time.**

By this Motion, the Debtor seeks authority to sell substantially all of its assets free and

clear of all liens, claims, encumbrances, and interests (i) by conducting the Inventory Sales at the

Stores pursuant to the Agency Agreement, and (ii) by selling the Intellectual Property[2], both of

---

[1] The Sale Order shall be filed prior to the Auction and Sale Hearing.
[2] At the present time, the Debtor has not selected a "stalking horse" bidder for the Intellectual Property.  The Debtor reserves the right to withdraw these assets from the sale contemplated by this Motion should no acceptable offer be received.

which will be subject to competitive bidding at the Auction.  Since seeking bankruptcy

protection on January 25, 2011, the Debtor has worked diligently with its advisors to develop a

strategy that would preserve the company's existing operations and maximize the value of its

assets for all stakeholders.  Unfortunately, due to the current strain on the Debtor's cash flow and

consequent inability to purchase new inventory for the spring season, the Debtor is not in a

position to reorganize its business without the immediate infusion of substantial working capital.

As it became clear that the Debtor would be unable to reorganize its business without additional

working capital, the company began the dual-process of pursuing various sources for such

financing while also soliciting bids for the liquidation of the company's inventory, furniture,

fixtures, and equipment at the Debtor's unprofitable retail locations, which would be closed in

any event even if the Debtor did find such financing.  Ultimately, no sources of additional

working capital emerged, thereby eliminating the possibility of a stand-alone recapitalization of

the Debtor.  As a result, the Debtor, in its business judgment, now believes that Inventory Sales

at each of its Stores and a separate process to sell Intellectual Property (and other assets) will

maximize the value of those assets for all of its constituents.  Thus, the Debtor has elected to sell

its inventory and furniture, fixtures, and equipment through the Inventory Sales, while at the

same time, separately soliciting bids for its Intellectual Property.

As further set forth below, the Debtor has negotiated an Agency Agreement (the "Agency

Agreement") with Gordon Brothers, a nationally recognized liquidation firm, pursuant to which

the Agent will liquidate the Debtor's inventory and furniture, fixtures, and equipment at the

Stores and will pay the Debtor a guaranteed percentage of the cost value of the assets sold,

subject to higher and better offers at the Auction.  The Debtor believes that conducting the

Inventory Sales is the most efficient means of generating the maximum value for the Debtor's

inventory and other assets in each Store.  Separately, the Debtor, with the assistance of its

professionals, is actively seeking offers to purchase its Intellectual Property (and other assets)

and intends to sell such assets if an acceptable offer is received in accordance with the Bid

Procedures.

The Debtor seeks an emergency hearing on this Motion, pursuant to MLBR 9013-

1(g)(1)(A) with respect to entry of the Bid Procedures Order, because the Debtor primarily sells

children's outwear, which is most in demand during the winter months.  Therefore, the Debtor

believes that commencing the Inventory Sales as soon as possible will facilitate the highest

return for these assets.

In further support of this Motion, the Debtor respectfully states as follows:

### Background

1.      On January 25, 2011 (the "Petition Date"), the Debtor filed a voluntary petition

for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

District of Massachusetts (the "Court").

2.      The Debtor has continued in possession of its property and has continued to

operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108

of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner.

3.      On February 4, 2011, the U.S. Trustee appointed the Committee in this case,

consisting of seven (7) of the Debtor's largest unsecured creditors.

4.      For over 30 years, Rugged Bear has been selling high quality children's clothes.

Rugged Bear operates 29 retail stores across 7 states in New England, New York, and New

Jersey.  The Debtor focuses on providing its customers with a convenient and familiar retail

experience through its neighborhood locations and with reasonable prices and high quality for its

products.  The Debtor's assets consist primarily of: (i) cash; (ii) inventory; (iii) fixed assets; and (iv) accounts receivable.  As of the Petition Date, the Debtor had approximately $176,000.00 of cash on hand, inventory with a book value of approximately $6,281,000.00,[3] fixed assets with a book value of approximately $1,278,000.00, and accounts receivable (i.e. short term credit card receivables) of approximately $408,000.00.

5.       As of the Petition Date, the Debtor owed TD Bank approximately $4,278,496.00 pursuant to a revolving line of credit (the "Prepetition Obligations").  TD Bank asserts that the Prepetition Obligations are secured by a lien against substantially all of the Debtor's assets.

6.       On January 27, 2011 the Debtor filed its "first day" motions requesting authority to use cash collateral [Docket No. 15]; pay wages, compensation, employee benefits, and other related obligations [Docket No. 16]; honor prepetition obligations to customers and otherwise continue customer practices and programs [Docket No. 17]; continue using bank accounts, business forms, and cash management system [Docket No. 18].  On January 28, 2011, the Court granted the relief requested in the Debtor's "first-day" motions following an emergency hearing [Docket Nos. 31, 32, 34, 35].

**Sale Process**

7.       The Debtor's chapter 11 case was filed on an emergency basis.  As the dust settled after the Debtor's bankruptcy filing, the Debtor determined that if there was a go-forward strategy for its business, it was premised on closing unprofitable Stores and operating as a smaller retail chain.  To execute such a strategy, however, the Debtor would require an immediate infusion of additional working capital.  As the Debtor and its professionals fine tuned the company's "go-forward" financial model, it became clear that the immediate cash need was

---

[3] The retail value of the Debtor's Petition Date inventory was approximately $10,275,000.00.

simply too significant and that raising such a large amount of money in the short term was not feasible.

8.      Although the Debtor, with the assistance of its financial and restructuring advisor, Consensus Advisors ("Consensus"), has been actively pursuing sources of such working capital, it was simultaneously soliciting bids for the liquidation of inventory and furniture, fixtures, and equipment at its unprofitable Stores, which would be closed regardless of whether or not the Debtor was able to develop a viable reorganization strategy for its remaining locations.

9.      Consistent with this dual-track approach, in late January, the Debtor began to solicit bids from professional liquidators to conduct Inventory Sales at the company's unprofitable Stores. These firms either made their interest known to the Debtor or were approached by Consensus.  In total, four (4) firms submitted written proposals.  Each of these firms is highly experienced in disposing of inventory and other assets.

10.      Ultimately, the Debtor concluded that it would be unable to obtain the additional working capital necessary to reorganize its business and determined, in its business judgment, to accept the highest and best offer received from the professional liquidators.  Because the Debtor believes that without any reasonable prospect of additional working capital or the ability to purchase new inventory, a chain-wide Inventory Sale will maximize the recovery of those assets and, combined with a sale process for Intellectual Property (and other assets), is in the best interests of its estate, its creditors, and other parties in interest.  After reviewing the proposals submitted, the Debtor selected Gordon Brothers to be its stalking horse bidder with respect to the Inventory Sales due to its superior pricing, its many years in business, its history of success in conducting store closing sales, and its experience in running such sales in the types of locations in which the Debtor operates.

11.    In addition, given its 30-year history selling high quality children's clothing in New England, New York, and New Jersey, the Debtor believes that its Intellectual Property (and in particular, its tradename, trademark, and web address) may have significant value separate from the existing retail Stores in which the Debtor presently operates.  The Debtor is actively working with Consensus to locate a potential buyer for those assets and intends to sell the Intellectual Property at the Auction, free and clear of liens, claims, encumbrances, and interests, should such a buyer emerge.  Given the potential for bids on the Intellectual Property, individual store leases, and related assets, the Debtor is soliciting such bids, but it is <u>not</u> seeking to assume or assign any Store Leases at this time.

## **Relief Requested**

12.    By this Motion, the Debtor respectfully requests authority to: (i) sell substantially all of its assets free and clear of any and all liens, claims, encumbrances, and interests; (ii) conduct the Inventory Sales at the Debtor's Stores; (iii) enter into the Agency Agreement with Gordon Brothers, subject to higher and better counteroffers; (iv) establish the Bid Procedures to select higher or better offers to conduct the Inventory Sales and to solicit offers to separately sell the Intellectual Property; (v) pay the breakup fee to the Agent should it not be the successful bidder for the Inventory Sales; (vi) schedule the Auction and Sale Hearing to consider this Motion and entry of the Sale Order; (vii) approve the form and manner of notice; and (vii) shorten the notice period required by Rule 2002(a)(2) pursuant to Rule 9006(c)(1) to the extent necessary so that the Inventory Sales may commence no later than March 1, 2011.

13.    By this Motion, the Debtor requests authorization to (i) enter into the Agency Agreement with Gordon Brothers to conduct the Inventory Sales at the Stores and (ii) sell the

Intellectual Property (and other assets) should a potential bidder provide an acceptable bid,[4] subject to higher and better offers at the Auction.  The Debtor also requests, pursuant to section 363(f) of the Bankruptcy Code, that the inventory and other assets included within the Inventory Sales and the Intellectual Property (and other assets) be sold free and clear of liens, claims, encumbrances, and other interests, with such liens, claims, encumbrances, or interests attaching to (1) the Debtor's share of the proceeds of the Inventory Sales, as set forth in the Agency Agreement and (2) the Debtor's proceeds from any sale of the Intellectual Property.

14.     The Debtor believes that it is in the best interests of its estate and its creditors to conduct the Inventory Sales and to liquidate the inventory (the "Merchandise") and furniture, fixtures, and equipment (the "FF&E") located in each of its Stores.[5]  Unless offers to purchase individual Store Leases are received by the Debtor, the Debtor will not be seeking to assume and assign Leases.  Nevertheless, the Debtor intends to file a motion seeking to establish procedures to reject the leases for each of the Stores (unless assumed and assigned) as of the date each Store is surrendered to the landlord.  In addition, to minimize any potential objections from governmental authorities, landlords, or other interested parties, the Debtor proposes that the Inventory Sales be conducted in accordance with the procedures (the "Inventory Sale Guidelines") attached to the Agency Agreement as Exhibit 2.

15.     Further, the Debtor requests authority that the Merchandise to be sold by the Agent in the Inventory Sales include goods which are subsequently acquired based on the Debtor's existing "open orders."  Specifically, the Debtor currently has certain "open orders" for Merchandise which have not yet been shipped by its vendors.  The universe of these "open

---

[4] The Debtor reserves the right to withdraw the Intellectual Property from the sale contemplated by this Motion should an acceptable bid not be received.
[5] The FF&E does not contemplate that any of the Debtor's business records or data contained on any of its computers or other electronic equipment will be sold as part of the Inventory Sales.

orders" is set forth on Exhibit 5.2(b) to the Agency Agreement.  The Debtor is actively searching

for ways to bring these "open order" goods into its Stores so that they may be sold through the

Inventory Sales.  Though the Debtor intends to include "open order" Merchandise in the

Inventory Sales, the Agency Agreement and Inventory Sale Guidelines do not contemplate, and

the Debtor has not sought, to augment the Merchandise to be included in the Inventory Sales.

16.    The Debtor requests that the twenty-one (21) day notice required by Rule

2002(a)(2) be shortened pursuant to Rule 9006(c)(1), so as to permit the Inventory Sales to

commence on March 1, 2011.  The Debtor believes that it is essential to begin the Inventory

Sales as soon as possible since the Debtor's current inventory consists primarily of children's

winter outerwear and other seasonal clothing.  The Debtor submits that the value of the

Merchandise will be maximized if the Inventory Sales are conducted during the winter months

when its current mix of Merchandise is most in demand.  Accordingly, the Agency Agreement

provides that the Agent will commence the Inventory Sales one day after entry of the Sale Order,

which in any event cannot occur later than March 1, 2011.

17.    For the same reasons, the Debtor also requests that the Court waive the fourteen

(14) day stay provisions of Fed. R. Bankr. P. 6004(h) in connection with entry of the Sale Order

and permit the Inventory Sales to commence immediately upon its entry.

## The Agency Agreement

18.    The Agency Agreement,[6] attached hereto as Exhibit A, provides for the Agent to

act as the Debtor's exclusive agent to conduct the Inventory Sales at the Stores and contains the

following additional significant terms and provisions:[7]

---

[6] Capitalized terms not otherwise defined in this Motion shall have the meanings ascribed to them in the Agency
Agreement.
[7] Set forth herein is a non-exhaustive summary of certain of the terms and conditions of the Agency Agreement.  For
a complete understanding of the specific terms and conditions, parties are referred to the Agency Agreement.  To the

Guaranteed Amount.  The Agent shall pay the Debtor a guaranteed amount of the cost value of the Merchandise equal to 59.0% (the "Guaranteed Amount").  The Guaranteed Amount is subject to adjustment if the Cost Value of the Merchandise included in the Inventory Sales is less than $4.2 million or if the cost-value to retail-value relationship varies from 36.7%.  Of the Guaranteed Amount, 80% shall be paid to the Debtor on the second day after the Sale Order is entered.  A letter of credit for the remaining 20% will be posted by the Agent.

Agent's Fee.  After the proceeds of the Inventory Sales are used to pay the Guaranteed Amount and Expenses (as defined therein), the Agent shall receive a fee equal to 6% of the cost value of the Merchandise (the "Agent's Fee").  After payment of the Guaranteed Amount, Expenses, and Agent's Fee, the Debtor and the Agent shall each receive 50% of any excess proceeds of the Inventory Sales.

Expenses.  The Agent shall pay all Expenses incurred in connection with the Inventory Sales, including without limitation, (i) payroll for retained employees, (ii) employee benefits (not to exceed 16.5% of the base payroll for retained employees), (iii) store occupancy-related expenses (not to exceed the amounts set forth on Exhibit 4.1(c) attached to the Agency Agreement), (iv) retention bonuses for retained employees, (v) advertising and direct mailings, (vi) credit card fees, and (vii) central services expenses (not to exceed $5,000 per week).

Sale Term: The Inventory Sales shall commence on the day following entry of the Sale Order which shall not be later than March 1, 2011 (the "Sale Commencement Date") and shall end no later than May 31, 2011 (the "Sale Term").  At the conclusion of the Sale Term (or any earlier vacating of one or more stores), the Agent will ensure that the stores are left in "broom clean" condition.

19.    The Debtor believes that the terms and conditions of the Agency Agreement are reasonable and that the Debtor will realize a greater recovery from the Inventory Sales (and minimize expenses) by retaining a liquidation specialist.  In any event, the Debtor proposes that the Agency Agreement be subject to better counteroffers and believes that doing so will enable the Debtor to obtain the best possible outcome for all of its stakeholders.

---

extent there is any inconsistency between the summary and the Agency Agreement, the terms of the Agency Agreement shall control.

**Bid Procedures and Auction**

20.    In order to ensure that the Debtor's estate is able to derive maximum value from the Inventory Sales, the Debtor proposes that the Agency Agreement be subject to higher and better offers.  The Debtor seeks to adopt procedures which will foster competitive bidding among potential liquidators, encourage potential "going concern" bids without eliminating or discouraging any other qualifying bids, including the present "stalking horse" bid by Gordon Brothers.  In connection therewith, the Debtor requests that the Court approve the Bid Procedures, attached hereto as Exhibit C.

21.    In order to streamline the bidding process, and enable the Debtor to compare bids submitted by other parties, the Debtor requests that the Court approve the Agency Agreement as the form to be used in submitting higher and better offers[8].  The Agency Agreement establishes the terms and conditions upon which a professional liquidator would serve as the Debtor's "agent" for purposes of liquidating the Debtor's Merchandise and FF&E, through the Inventory Sales, free and clear of any liens, claims, encumbrances, or interests pursuant to section 363(f) of the Bankruptcy Code, with such liens, claims, encumbrances, or interests attaching to the Debtor's share of the proceeds of the Inventory Sales.  The Agency Agreement also requires that all costs attendant to conducting the Inventory Sales, including, *inter alia*, all store level use and occupancy costs and payroll related expenses be paid from the Inventory Sale proceeds after payment of the Guaranteed Amount.

22.    Any party who wishes to submit a counteroffer to conduct the Inventory Sales or bid to purchase Intellectual Property (and other assets) must follow the Bid Procedures attached

---

[8] In the event of a "going concern" type bid for the Debtor's Merchandise, FF&E, one or more Store Leases and the Intellectual Property, the Debtor will entertain other forms of purchase agreement.

hereto as <u>Exhibit C</u>.  In summary, the Bidding Procedures have the following terms and

conditions:

(i)      Counteroffers for the Inventory Sale shall be in the form of the Agency Agreement and shall have a minimum Guaranteed Amount of 60% of the cost value of the Merchandise.  Thereafter, bidding for the Inventory Sales shall be in increments of no less than one quarter of one percentage point (0.25%) and shall continue until the highest and best bid prevails at the Auction.

(ii)     Bids seeking to purchase the Intellectual Property or other assets shall be in the form of a signed asset purchase agreement, which shall be in a form acceptable to the Debtor in its sole discretion and shall have no minimum purchase price.  Such bids shall be accompanied by a deposit equal to not less than ten percent (10%) of the proposed purchase price for the assets covered by such bid.  Thereafter, bidding for the Intellectual Property shall be in increments of no less than $25,000.00 and shall continue until the highest and best bid prevails at the Auction.  The Debtor reserves the right to withdraw the Intellectual Property from the sale should an acceptable offer not be received.

(iii)    The Agent and any bidder or counterbidder shall be entitled to submit a combined Counteroffer/Bid ("<u>Global Bid</u>") for the assets that are the subject of the Inventory Sales and sale of Intellectual Property and other assets and may participate in the Auction with respect to both, provided that such Global Bid allocates the proposed purchase price between the Inventory Sales assets and the Intellectual Property assets.  There is no minimum purchase price with respect to a Global Bid.  Thereafter, bidding for a Global Bid shall be in increments of no less than $25,000.00 and shall continue until the highest and best bid prevails at the Auction.

(iv)     If any bid contemplates the assumption and assignment of any Store Lease or other executory contract of the Debtor, the bidder must furnish the Debtor financial and other information with which the Debtor can establish "adequate assurance" as required by the Bankruptcy Code.

(v)      Immediately following the Auction, the Court will hold the Sale Hearing to confirm the highest and best bid and to approve the Inventory Sales and sale of Intellectual Property (and other assets as applicable).

(vi)     Anything to the contrary in the Bidding Procedures notwithstanding, any decision to be made thereunder by the Debtor shall be done in consultation with the Committee.

23.     The Agent shall be entitled to sell the Merchandise and the FF&E in the Stores

and the Intellectual Property (and other assets) free and clear of any liens, claims, encumbrances,

or interests pursuant to section 363(f) of the Bankruptcy Code, with such liens, claims,

encumbrances or interests with respect to such Merchandise and FF&E to attach to the sale

proceeds.

## AUTHORITY FOR RELIEF REQUESTED

**A.      The Court Should Permit the Inventory Sales and the Sale of the Intellectual
Property Pursuant to Section 363(b) and (f) of the Bankruptcy Code**

24.      Pursuant to section 363(b)(1) of the Bankruptcy Code, the trustee, "after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  "[A] judge determining a [section] 363(b) application [must]

expressly find from the evidence presented before him at the hearing a good business reason to

grant such an application." In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (Bankr. D. Del.

1991); Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063,

1071 (2d Cir. 1983).  Section 363(b) does not require that the Court substitute its business

judgment for that of the trustee.  See, e.g., In re Ionosphere Clubs, Inc., 100 B.R. 670, 676

(Bankr. S.D.N.Y. 1989).  Rather, the Court should ascertain whether the trustee has articulated a

valid business justification for the proposed transaction.  This is consistent with "[t]he broad

authority to operate the business of the debtor which . . . indicates Congressional intent to limit

court involvement in business decisions. " In re Airlift Int'l, Inc., 18 B.R. 787, 789 (Bankr. S.D.

Fla. 1982).

25.      The Debtor has concluded, after careful analysis and consultation with its

professionals that, in its business judgment, conducting the Inventory Sales and selling its

Intellectual Property (and other assets) will allow the Debtor to maximize the return to its estate

for those assets.  Accordingly, this Court should authorize the Inventory Sales set forth herein

and authorize and approve the use of the Agent to facilitate the liquidation of the Merchandise

and the FF&E pursuant to the Agency Agreement.  In addition, the Debtor has determined that a separate sale of its Intellectual Property may generate a significant amount of value for the Debtor's estate.

26.    The Debtor desires to sell the Merchandise, FF&E and the Intellectual Property (and other assets) free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances or interests to attach to the proceeds of such sales to the same extent, with the same validity, and in the same order of priority.  Section 363(f) of the Bankruptcy Code provides as follows:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property,
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

27.    The Debtor satisfies one or more of these requirements for selling the Merchandise, FF&E and Intellectual Property free and clear of liens, claims, encumbrances and interests. Among other things, the Debtor's prepetition secured lender, TD Bank, has consented to liquidating the Debtor's assets through the Inventory Sales.

**B.    The Inventory Sales Procedures Are Sufficient to Satisfy Federal, State and Local Laws, Regulations, and Rules Related to Store Closing and Liquidation Sales**

28.     The Debtor submits that the Inventory Sale Guidelines are sufficient to satisfy federal, state, and local laws, regulations, and rules related to store closing and liquidation sales. The Debtor is aware that certain states or localities in which the Stores are located have, or may require, certain licenses or similar requirements with respect to the conduct of store closing sales. In addition, some states and localities have statutes or regulations requiring creditor notification before a company conducts a bulk sale. To ensure that there will be no disruption or delay in its Inventory Sales, the Debtor requests that this Court authorize the Debtor, pursuant to section 105 of the Bankruptcy Code, to conduct the sales without the necessity of, and the delay associated with, obtaining various state licenses and/or satisfying any additional requirements in connection therewith. Because the attorneys general of all states where the Stores are located will receive notice of the sale contemplated by this Motion, as well as an opportunity to be heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary.

29.     In this case, state and local licensing requirements, time limits, or bulk sale restrictions would undermine the fundamental purpose of section 363(b) of the Bankruptcy Code by placing constraints on the Debtor's ability to marshal and maximize assets for the benefit of its estate and creditors. Accordingly, the Debtor requests the Court's authority to conduct the Inventory Sales without the necessity of obtaining various state and local licenses or observing state and local waiting periods or time limits. While many states waive these requirements when liquidation sales are conducted pursuant to a court order, the Debtor, out of an abundance of caution, requests that the Court enter an order waiving this requirement or deeming such requirements satisfied. In addition, the Debtor requests the Court waive any bulk sales laws, to the extent applicable, because creditors are protected by the notice provided by this Motion and

- 15 -

the jurisdiction of this Court.  The Debtor intends to and will comply with all state and local health and safety laws when conducting the Inventory Sales.

30.     The Debtor is aware that courts in this district require compliance with state and local laws when conducting going-out-of-business sales.  However, the Debtor submits that the relief requested herein is not inconsistent with this requirement as it believes that the Inventory Sale Guidelines conform to the requirements of state laws and regulations governing closing sales.  In addition, with the supervision of this Court, the requested relief will not undermine state and local requirements that would otherwise apply to the store closing sales.  Therefore, the Debtor requests that the Sale Order find that by following the Inventory Sale Guidelines, the Debtor will be presumed to have complied with state laws and regulations governing store closing and similar sales.

31.     The Debtor does not believe that any Inventory Sales should interfere with lease provisions that are intended to protect the image of the strip malls or other locations or avoid disruption of normal commerce.  Nonetheless, the Debtor requests the Court authorize the Debtor to conduct the store closing without interference by any of its landlords.  Certain of the leases governing the premises of the Stores may contain provisions purporting to restrict the ability of the Debtor to conduct store closing or liquidation sales.  Such provisions have been held to be unenforceable in chapter 11 cases as an impermissible restraint on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code. See, e.g., In re Ames Dep't Stores, Inc., 136 BR. 357, 358 (Bankr. S.D.N.Y. 1992) (enforcement of going-out-of-business sale restrictions in lease would contravene overriding federal policy requiring debtors to maximize assets); see also, In re Tobago Bav Trading Co., 112 B.R 463, 467 (Bankr. N.D. Ga.

1990) (lease restriction on going-out-of-business sale is unenforceable); <u>In re Lisbon Shops, Inc.</u>,

24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (same).

32.       The Debtor submits that the landlords' interests are protected notwithstanding the

nonenforceability of any such provision through the adoption of the Inventory Sale Guidelines.

Moreover, the Inventory Sale Guidelines contain, *inter alia*, restrictions on the day and times

when the Inventory Sales may be conducted, the manner in which the Inventory Sales may be

advertised at the Stores, and the conditions of the Stores at the conclusions of the Inventory

Sales.  The Inventory Sale Guidelines are generally consistent with store closing guidelines that

have been implemented in numerous retail chapter 11 cases.

### C.       The Court Should Approve the Agency Agreement

33.       As set forth herein, the Debtor believes that entering into the Agency Agreement

for the purpose of conducting the Inventory Sales is in the best interests of its estate and its

creditors and, accordingly, represents a prudent and proper exercise of the Debtor's business

judgment.  Adequate business justification exists to authorize the Debtor to enter into the Agency

Agreement to conduct the Inventory Sales so that the Debtor may maximize recoveries for its

Merchandise and FF&E through the Inventory Sales.

34.       The Debtor believes that the Agency Agreement provides several benefits and

will maximize the value of the Merchandise and FF&E.  First, the Agent is a nationally

recognized professional liquidator experienced in conducting sales of this nature.  By retaining

the Agent to sell the Merchandise and the FF&E at the Stores, the Debtor will be able to

maximize sale proceeds.  Second, the Agency Agreement represents a more-cost effective

manner for the Debtor to conduct the Inventory Sales because the Agent has extensive

knowledge, expertise, and experience in conducting such store closing sales and the Guaranteed

Amount provided to the Debtor as consideration to conduct the Inventory Sales is subject to higher and better offers.

**D.     The Court Should Approve the Bid Procedures and the Breakup Fee**

35.     The Debtor submits that the Bid Procedures, including the breakup fee to the Agent, will benefit the estate as the right to perform the liquidation of the Debtor's Merchandise and FF&E is open to competitive bidding.  Because break up fees and expense reimbursements are usually necessary to attract initial offers, courts have routinely approved them in connection with asset sales in similar Chapter 11 cases. See, e.g., In re Integrated Resources. Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd 147 B.R. 650 (S.D.N.Y. 1992); In re Hupp Indus., 140 B.R. 191 (Bankr. N.D. Ohio 1991).

36.     Subjecting the Agency Agreement to higher and better counteroffers will benefit the Debtor's estate because it will force any and all prospective bidders to make a proposal in response to a specific, fully negotiated agreement to conduct the Inventory Sales.  Gordon Brothers has indicated that it would not enter into the Agency Agreement unless the Debtor agrees to pay the breakup fee in the event that Gordon Brothers is not the successful bidder.

37.     The Debtor believes that it is in the best interests of its estate and its creditors to subject the Agency Agreement to competitive bidding.  Moreover, the Debtor believes that the breakup fee of $35,000 is quite reasonable and represents less than 2% of the Guaranteed Amount and is designed to compensate Gordon Brothers for its due diligence in negotiating and entering into the Agency Agreement.

**E.     The Relief Requested By This Motion Is Appropriate And In The Best Interests Of The Debtor's Estate And Creditors.**

38.     There is more than adequate business justification to support approval of the Inventory Sales of the Merchandise and FF&E pursuant to the Agency Agreement, as well as a

sale of the Intellectual Property.  The Debtor has determined, in its business judgment, that conducting a chain-wide liquidation through the Inventory Sales and separately selling the Intellectual Property will maximize the value of the Debtor's assets.

39.     The Debtor believes that the Bid Procedures will generate the highest possible return on the Merchandise, FF&E, and Intellectual Property being sold.  Accordingly, the Debtor submits that granting the relief requested herein is in the best interests of the Debtor's estate, creditors, and other parties-in-interest.

**F.     The Court Should Shorten the Notice Requirement Since Commencing The Inventory Sales Immediately Will Maximize The Value Of The Assets**

40.     The Debtor seeks to shorten notice of this Motion to the extent necessary so that the Court may set a counteroffer deadline and schedule an Auction and Sale Hearing during the last week in February, which will enable the Debtor to commence the Inventory Sales no later than March 1, 2011.  Were the Court to grant the Debtor's request, it may require notice of this Motion to be shortened by as much as seven (7) days, but the Debtor believes that doing so is necessary in this case.

41.     Rule 2002(a)(2) requires a debtor to provide at least twenty-one (21) days notice by mail of any proposed use, sale, or lease of property of the estate outside of the ordinary course of business, *unless the court for cause shown shortens the time*.  See FED. R. BANKR. P. 2002(a)(2) (emphasis added).  Further, the Court has the authority to shorten the notice period for the Motion pursuant to Rule 9006(c)(1) for cause shown.  See FED. R. BANKR. P. 9006(c)(1).

42.     The Debtor believes that good cause exists to shorten the notice period required for the Motion because, among other reasons: (i) TD Bank - the only secured creditor in this chapter 11 case - has assented to the relief sought therein; (ii) the Debtor wants to complete the Inventory Sales in sufficient time to avoid incurring additional operating losses, and unnecessary

rental and utility obligations at the Stores; and (iii) it is in the business judgment of the Debtor

that commencing the Inventory Sales immediately during the winter months will maximize the

value of the assets given that the Debtor's existing inventory mix consists of winter clothes and

seasonal goods.  Accordingly, by shortening the twenty-one (21) day notice requirement, the

Debtor may commence the Inventory Sales at a time when demand for its products is at its

highest.

**NOTICE**

43.    No trustee or examiner has been appointed in the Debtor's chapter 11 case.  The

Debtor proposes that the "notice and hearing" requirements set forth in sections 363(b) and (f) of

the Bankruptcy Code be satisfied by serving copies of the Motion upon, or in lieu thereof, to

their counsel, if known: (i) the U.S. Trustee; (ii) counsel for TD Bank; (iii) counsel for the

Committee; (iv) the creditors holding the twenty (20) largest claims against the Debtor's estate;

(v) all known taxing authorities of the Debtor; (vi) landlords for the Stores; (vii) counsel for

Gordon Brothers; (viii) all attorneys general for the states in which the Stores are located; and

(ix) all other entities that have filed requests for notices pursuant to Rule 2002.  The Debtor

submits that in light of the nature of the relief requested such notice is appropriate under the

circumstances of this case and that no further notice is needed.

44.    In addition, the Debtor intends to serve this Motion on all parties who the Debtor

or its advisors reasonably believe may have, or have previously expressed, an interest in the

Debtor's assets.

WHEREFORE, the Debtor respectfully requests that the Court (i) authorize the sale of

substantially all of the Debtor's assets free and clear of liens, claims, encumbrances, and interests

by entry of the Sale Order; (ii) approve the conduct of the Inventory Sales in accordance with the

Inventory Sale Guidelines; (iii) approve the Agency Agreement and breakup fee contemplated

thereby, subject to higher and better offers; (iii) schedule the Auction to consider any

counteroffers to conduct the Inventory Sales or bids to purchase the Intellectual Property; (iv)

schedule the Sale Hearing to consider this Motion; (v) approve the form and manner of notice of

this Motion, Auction, and Sale Hearing and shorten such notice to the extent necessary to

commence the Inventory Sales by March 1, 2011; (vi) grant emergency consideration of this

Motion with respect to entry of the Bid Procedures Order; and (vii) grant such other and further

relief as may be just and proper.

Dated:  Boston, Massachusetts
        February 11, 2011

Respectfully submitted,

THE RUGGED BEAR, INC. f/k/a RB ACQUISITION
CORP.

By its proposed counsel,

*/s/ Charles A. Dale III*
Charles A. Dale III (BBO No. 558839)
Mackenzie L. Shea (BBO No. 666241)
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111
Tel:  (617) 261-3100
Fax: (617) 261-3175

E-mail:
        chad.dale@klgates.com
        mackenzie.shea@klgates.com