EXECUTION COPY

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this March 2, 2011 by and between a joint venture comprised of Liquid Asset Partners LLC and Solid Asset Solutions LLC (together, the "Agent") and The Rugged Bear Company and its affiliated debtors and debtors-in-possession with a principal place of business at 117 Lenox Street, Norwood, MA 02062 (collectively, the "Merchant").

Section 1. Recitals.

WHEREAS, the Merchant operates retail stores in the United States and desires that the Agent act as the Merchant's exclusive agent for the limited purpose of : (a) selling all of the Merchandise (as hereinafter defined) located in Merchant's retail store location(s) identified on Exhibit 1 attached hereto (each individually a "Store," and collectively the "Stores"), and all of the Merchandise located at Merchant's Norwood, MA distribution center (collectively, the "Distribution Center") that has been or will be transferred by Merchant to the Stores, by means of a "going out of business", "inventory sale," "store closing", "sale on everything", "everything must go" or similar themed sale (as further described below, the "Sale"); and (b) disposing of the Owned FF&E.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 2. Appointment of Agent.

2.1    Appointment of Agent.  Effective on the date hereof, the Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale and disposing of Merchant's Owned FF&E, in accordance with the terms and conditions of this Agreement.

2.2  Bankruptcy Court Approval.  As soon as practicable after Merchant's execution of this Agreement, Merchant shall apply to the United States Bankruptcy Court for the District in which it commences a chapter 11 proceeding ("Bankruptcy Court") for an order or orders approving this Agreement in its entirety in form and substance satisfactory to Agent (the "Approval Order").  The Approval Order shall be satisfactory to TD Bank, N.A. ("Lender") and shall provide, among other things, that: (i) this Agreement is in the best interests of Merchant, Merchant's estate, creditors, and other parties in interest; (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon the payment of the Guaranteed Amount Deposit and delivery of the Letter of Credit, Agent shall be entitled to sell all Merchandise and Owned FF&E hereunder free and clear of all liens, claims, or encumbrances thereon; (v) subject to  the payment of the Guaranteed Amount Deposit and delivery of the Letter of Credit to Lender, any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds shall attach only to the Guaranteed Amount, any Sharing Amount due to Merchant hereunder and amounts reimbursed by the Agent to Merchant on account of Expenses; (vi) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment, and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (vii) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, and otherwise promote the Sale as a "going out of business", "inventory sale," "store closing", "sale on everything", "everything must go", or similar themed sale, without further consent of any person in accordance with the terms and conditions of this Agreement and the form of sale guidelines attached

hereto as Exhibit 2 (the "Sale Guidelines") and without further compliance with applicable federal, state or local laws governing, *inter alia*, the conduct of store closing sales (the "Liquidation Sale Laws"), other than those designed to protect public health and safety; (viii) Agent shall be granted a limited license and right to use until the Sale Termination Date the trade names, customer lists, email lists and social networking sites, and logos relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (ix) each and every federal, state, or local agency, department, or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including (without limitation) the conducting and advertising of the Sale in the manner contemplated by this Agreement, and no further approval, license, or permit of any governmental authority shall be required; (x) all utilities, landlords, creditors, and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, institute any action in any court (other than in the Bankruptcy Court) or before any administrative body that in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (xi) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xii) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement, and Agent shall have no successor liabilities whatsoever; (xiii) Agent's security interest provided herein and sales of Merchandise shall be protected in the event that the Approval Order is reversed or modified on appeal pursuant to Sections 364(e) and 363(m); (xiv) any amounts owed by Merchant to Agent under this Agreement shall be granted the status of administrative expense claims in Merchant's bankruptcy case pursuant to Section 503(b) and 507(a) of the Bankruptcy Code and secured by valid and perfected first-priority security interests in accordance with Section 15 of this Agreement; (xv) a finding that time is of the essence in commencing the Sale at the Stores; (xvi) a finding that the Debtors' decisions to (a) execute this Agreement and (b) perform under and make the payments required by the Agency Agreement is a reasonable exercise of the Debtors' sound business judgment consistent with their fiduciary duties and is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; (xvii) a finding that this Agreement was negotiated in good faith and at arms' length between the Debtors and Agent; (xviii) a finding that Agent's performance and continued performance under this Agreement was and will be, and payment of the Guaranteed Amount under this Agreement was and will be so made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code; and (xix) in the event any or all of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code section 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the liens or priority authorized or created under this Agreement or the Approval Order.

Section 3.  Consideration to Merchant and Agent.

3.1 Payments to Merchant.

(a)  Subject to Merchant's compliance with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive sixty percent (60.0%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined using the Gross Rings method per Section 5.1 below (and as otherwise expressly provided for in this Agreement).

(b) The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise, being four million, two hundred thousand dollars ($4,200,000) (the "Merchandise Threshold"). To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c) The Guaranty Percentage has been fixed based upon the aggregate Cost Value-to-Retail Value relationship of the Merchandise, being thirty-six and seven-tenths percent (36.7%) (the "Cost Factor Threshold"). To the extent that the aggregate Cost Value-to-Retail Value relationship of the Merchandise varies from the Cost Factor Threshold the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

(d) The respective adjustments contemplated by subsections (b) and (c) above shall operate independently and cumulatively if applicable.

3.2 Compensation to Agent, Sharing:

(a) After Proceeds are used to pay the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: (i) FIRST: to Agent in an amount equal to six percent (6%) of the Cost Value of the Merchandise ("Agent's Fee"); and (ii) THEREAFTER: fifty percent (50%) to Agent and fifty percent (50%) to Merchant ("Sharing Amounts").

(b) To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), Agent shall use commercially reasonable efforts to dispose of all of such Remaining Merchandise by means of bulk sale/wholesale or otherwise, and the proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3 Proceeds; Time of Payments; Control of Proceeds.

(a)     For purposes of this Agreement, "Proceeds" shall mean the aggregate of (i) the total amount (in dollars) of all sales of Merchandise made under this Agreement during the Sale Term and exclusive of Sales Taxes; and (ii) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale Term; and (iii) any and all proceeds received by Agent from the disposition of Remaining Merchandise.

(b)     On the second business day following entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant eighty percent (80%) of the estimated Guaranteed Amount (the "Initial Guaranty Payment"), calculated based upon the estimated aggregate Cost Value of the Merchandise to be included in the Sale as reflected on Merchant's books and records on the date immediately preceding the Sale Commencement Date (the "Estimated Guaranteed Amount") by wire transfer to the following account: the Debtor's debtor-in-possession account # 8247927970 at TD Bank, N.A. ("Merchant Account"). In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent also shall furnish Merchant an irrevocable standby Letter of Credit naming Lender, for the benefit of Merchant, as beneficiary (the "Beneficiary") in the aggregate original face amount equal to twenty percent (20%) of the Estimated Guaranteed Amount, which letter of credit shall be substantially in the form of Exhibit 3.3 hereof (the "Letter of Credit"). The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date. Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiary shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days. If the

Beneficiary fails to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then Beneficiary shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay the Guaranteed Amount, or portion thereof, or any Expenses, the Beneficiary may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount or Expenses that is not the subject of a reasonable dispute. Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount made to the time of each such request (and Merchant shall cooperate with respect to each such request).  To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation.  To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation.

(c)  If at any time Agent has paid more on account of the Guaranteed Amount than the actual Guaranteed Amount, Merchant shall (on two business days written notice by Agent) repay the overfunded amount to Agent.  If for any reason Merchant fails to timely repay such overfunded amount to Agent, then to the extent that Lender received any funds on account of the Guaranteed Amount from Agent or Merchant, then the Lender shall (on two business days written notice by Agent) disgorge and remit such overfunded amount to Agent.

(d)  All Proceeds shall be controlled by Agent in the manner provided for below.

(i)      Agent may establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds and the distribution of amounts payable hereunder. Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fee and charges, including wire transfer charges, related to the Agency Accounts, whether received during or after the Sale Term.  Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)      Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant identification number(s) and existing bank accounts for credit card Proceeds relating solely to the Sale.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term.

(iii)      Prior to the date Agent establishes the Agency Accounts, all Proceeds (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into

depository accounts designated by, owned and in the name of, Merchant for the Store, which accounts shall be designated solely for the deposit of Proceeds (including credit card Proceeds), and the disbursement of amounts payable by Agent hereunder (the "Designated Deposit Accounts").

(iv)    On each business day following the Payment Date (or on such other periodic basis acceptable to Agent in its sole discretion), Merchant shall pay to Agent by wire funds transfer all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales) deposited into the Designated Deposit Accounts.

(e)    Either party may offset amounts held by them for application pursuant to the terms of this Agreement.

(f)    In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date, and shall reimburse Merchant on a dollar for dollar basis therefor.

Section 4.    Expenses of the Sale.

4.1 Expenses.  Agent shall be responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term, limited to the following:

(a) all payroll  for all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store during the Sale Term as well as payroll for any of Merchant's former employees or temporary labor engaged for the Sale;

(b) any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Benefits) for Retained Employees used in the Sale, in an amount not to exceed 16.5% of the base payroll for each Retained Employee in the Stores (the "Benefits Cap") during the Sale Term;

(c) the Occupancy Expenses categorized on Exhibit 4.1(c), (including without limitation the non-rent amounts with respect to percentage rent Stores identified on Exhibit 4.1(c)), but in all cases limited to a per Store and per diem basis not to exceed the respective categories and amounts shown on Exhibit 4.1(c);

(d) All percentage rent obligations incurred during the Sale Term, subject to the contractual percentages for calculating such percentage rent identified on Exhibit 4.1(c);

(e) Retention Bonuses for Retained Employees, as provided for in Section 9.4 below;

(f) advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(g) credit card fees, bank card fees, chargebacks and discounts with respect to Merchandise sold in the Sale;

(h) bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(i) costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(j) the costs of moving, transferring, or consolidating Merchandise between and among the Stores (and for purposes of the avoidance of doubt, transfers of DC/On Order Merchandise from the Distribution Center to any one or more other Stores (including the Store located adjacent to the Distribution Center) shall not constitute a transfer of Merchandise between and among the Stores but shall be performed at Merchant's expense pursuant to Agent's reasonable directions);

(k) the pro-rata portion of Merchant's property and casualty insurance premiums attributable to the Stores during the Sale Term;

(l) the costs of trash removal, and ordinary course third party cleanings at the Stores during the Sale Term and as may be necessary to leave each Store in "broom clean" condition, to the extent not covered on Exhibit 4.1(c).

(m) all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(n) Store cash theft and other store cash shortfalls in the registers;

(o) Agent's on-site supervision of the Store, including any and all fees, wages, and deferred compensation of field supervisory personnel used in connection with the Sale, travel to, from or between the Stores and incidental out-of-pocket and commercially reasonable travel expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(p) postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(q) an amount equal to five thousand dollars ($5,000) per week during the Sale Term in consideration of Merchant's provision of Central Services and other assistance in connection with the Sale;

(r) All costs and expenses of social networking sites (including without limitation the operation of or modification to Merchant's website, Facebook and Twitter sites if used by Agent in conducting or promoting the Sale pursuant to Section 8.2(b) below), which shall be paid without regard to the weekly cap for Central Services;

(s) Agent's actual cost of capital (including Letter of Credit fees) and insurance; and

(t) Agent's out-of-pocket costs and expenses (including but not limited to legal fees and expenses) incurred in connection with the review of data, preparation, negotiation and execution of this Agreement, the Approval Order and any ancillary documents, and in connection with the Sale.

There will be no double payment of Expenses, and to the extent that Expenses appear or are contained in more than one Expense category, and to the extent that any cap applies to any Expense shown in more than one category above, the lowest cap shall apply.

As used herein, the following terms have the following respective meanings:
"Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to payroll processing, MIS services, POS services, cash and inventory reconciliation, data processing and reporting

"Excluded Benefits" means (i) benefits arising, accruing or attributable to (w) vacation days or vacation pay, (x) sick days or sick leave or any other form of paid time off, (y) maternity leave or other leaves of absence, termination or severance pay and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Benefits Cap, including, without limitation, any payments due under the WARN Act.

"Occupancy Expenses" means, with respect to a Store, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, housekeeping and cleaning expenses, and rental for furniture, fixtures and equipment, and any and all other occupancy and occupancy-related expenses associated with the Sale and/or the Store.

Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses of any kind or nature in

excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Distribution Center, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid by solely by Merchant promptly when due.

4.2 <u>Payment of Expenses</u>.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; <u>provided</u>, <u>however</u>, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts and reconciled once the actual amount of such Expense becomes available.  Agent and/or Merchant may review or audit the Expenses at any time.

Section 5.  <u>Gross Rings; Merchandise</u>.

5.1 <u>Gross Rings</u>.  Agent and Merchant shall keep a strict count of register receipts and reports ("<u>Gross Rings</u>") to determine the composition of the Merchandise sold by SKU.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  The Agent and Merchant agree that they will, and agree to cause their respective representatives to, cooperate and assist in the determination of the composition of the Merchandise included in the Sale, including, without limitation, the making available to the extent necessary of books, records, work papers and personnel.  The amount of the Guaranteed Amount shall include a one and three-quarter percent (1.75%) increase to the Gross Rings calculation of the Cost Value of the Merchandise to account for shrink during the Sale Term.

5.2 <u>Merchandise Subject to This Agreement</u>.

(a)    For purposes of this Agreement, "<u>Merchandise</u>" shall mean all: (i) Store Merchandise; (ii) DC/On Order Merchandise; and (iii) Defective Merchandise (to the extent not Excluded Defective Merchandise).  Notwithstanding the foregoing, "Merchandise" shall not include: (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores (collectively, "<u>FF&E</u>"); (4) Excluded Defective Merchandise; (5) Late Arriving DC/On Order Merchandise; or (6) Merchant Consignment Goods.

(b)    As used in this Agreement the following terms not elsewhere defined herein shall have the respective meanings set forth below:

"<u>Defective Merchandise</u>" means any item of Store Merchandise or DC/On Order Merchandise with minor damage or defects but which nevertheless is still suitable, saleable, and usable for its intended purpose.  Agent shall identify and advise the Merchant of its findings with respect to the existence Defective Merchandise as soon as practicable following the Sale Commencement Date (but in no event later than 30 days after the Sale Commencement Date).

"Excluded Defective Merchandise" means any item of Defective Merchandise which is sufficiently damaged or defected such that it is not suitable, saleable, or usable for its intended purpose because it is damaged, ripped, torn, worn, faded, broken, mismatched, mismated, incomplete, discolored, returned, or otherwise affected by damages or defects.  Agent shall identify and advise the Merchant of its findings with respect to the existence Excluded Defective Merchandise as soon as practicable following the Sale Commencement Date (but in no event later than 30 days after the Sale Commencement Date).

"DC/On Order Merchandise" means the new, saleable, first quality finished goods inventory (including for the avoidance of doubt packaway inventory that otherwise is new, saleable, first quality finished goods inventory) that is identified on Exhibit 5.2(b) which: as of the Sale Commencement Date are either located at the Distribution Center or are subject to pending on-order purchase orders.  The parties expressly agree that Merchant shall be solely responsible for the processing (including without limitation ticketing in the ordinary course consistent with Merchant's historic periods), picking, packing, and shipping associated with the timely transfer (according to a detailed arrivals calendar to be provided by Agent to Merchant on or about the Sale Commencement Date), into the Stores of goods which are intended to become DC/On Order Merchandise.

"Merchant Consignment Goods" shall have the meaning assigned to such term in Section 5.4 below.

"Store Merchandise" means all new, saleable, first quality finished goods inventory which as of the Sale Commencement Date is located at the Stores.

5.3    Valuation.
(a)    Subject to Section 5.3(b) and 5.3(c), "Cost Value" with respect to the Store Merchandise shall mean the cost for the Merchandise as reflected on Merchant's inventory files shown on the document named CURRENT ON HAND BY DEPT & STORE 1-31-2011.XLS available on Merchant's electronic due diligence site as of 2/1/11 ("Cost File").

(b) With respect to all DC/On Order Merchandise, and with respect to any item of Store Merchandise for which the SKU is not specifically referenced on the Cost File, the "Cost Value" shall be Merchant's actual cost (as determined in a manner consistent with the Cost File and historic practices), but in no event shall the "Cost Value" of all Merchandise as determined using the method contemplated by this Section 5.3(b) exceed the Cost Factor Threshold in the aggregate.

(c) Notwithstanding Section 5.3(a) or (b) above, if the selling retail price (but excluding POS discounts) as of the Sale Commencement Date (or any date during the immediately preceding 30 days) of any item of Merchandise is less than the Cost Value thereof (as calculated by Section 5.3(a) or 5.3(b), as the case may be), the "Cost Value" of such item of Merchandise for purposes of this Agreement shall instead be such lower selling retail price.

(d)    "Retail Value" for each item of Merchandise shall be the "original retail price" as reflected on Merchant's books and records maintained in the ordinary course,  determined using the "Gross Rings" method per Section 5.1 above.

5.4    Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant Consignment Goods" at prices established by the Agent.  The Agent shall retain 20% of the sale price for all sales of Merchant Consignment Goods, and Merchant shall receive 80% of the receipts in respect of such sales.  Merchant

shall receive its share of the receipts of sales of Merchant Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell merchandise not included as Merchandise, then all such items will be removed by Merchant from the Stores at its expense as soon as practicable.  Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

Section 6.  Sale Term.

6.1 Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the first day following entry of the Approval Order (but in no event later than March 4, 2011) (the "Sale Commencement Date").  Agent shall complete the Sale at each Store no later than May 31, 2011 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale at any Store upon not less than five (5) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"); provided however that Agent shall cooperate with Merchant to provide more than 5 days' prior notice if commercially reasonable circumstances permit (it being understood that Agent shall not be obligated to provide such additional notice).

6.2 Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises, and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the Vacate Date.  All assets of Merchant used by Agent in the conduct of the Sale shall be returned by Agent to Merchant at the end of the Sale Term to the extent the same have not been consumed in the conduct of the Sale or sold (e.g., Supplies).

Section 7.  FF&E.

7.1 With respect to the furniture, fixtures, and equipment owned by Merchant, located at the Stores, Distribution Center and Merchant's corporate office, and designated by Merchant (on or prior to the 7th day following the Sale Commencement Date) for sale (the "Owned FF&E"), Agent shall sell the Owned FF&E, and Agent shall be entitled to receive a commission equal to twenty percent (20%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided however Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between Merchant and Agent promptly following Merchant's designation of the Owned FF&E ("FF&E Expenses").  At the conclusion of the Sale Term, Agent may abandon, in place, any unsold Owned FF&E, and any other furniture, fixtures, and equipment located at the Stores, without liability to Merchant or any third party.

Section 8.  Conduct of the Sale.

8.1 Rights of Agent.  Agent shall be permitted to conduct the Sale as a "going out of business," "store closing," "sale on everything," "everything must go," or similar themed sale throughout the Sale Term.  The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement, the Approval Order and the Sale Guidelines.  In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a) to establish Sale prices and Store hours;

(b) except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, customer lists, mailing lists, email lists, and social networking sites (including without limitation Merchant's website, Facebook and Twitter sites solely for purposes of promoting the Sale), computer hardware and software, existing supplies located at the Store, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Store, and any other assets of Merchant located at the Stores (whether owned, leased, or licensed);

(c) to be provided by Merchant (at no additional cost to Agent) with: (i) central office facilities, central administrative services and personnel to process payroll, perform MIS and POS services, reconcile cash and inventories, process and report data, and provide other central office services reasonably necessary for the Sale; (ii) use of reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) peaceful use of the Distribution Center for one or more public sale events in order to sell Merchandise directly out of the Distribution Center; and

(d) to establish and implement advertising, signage and promotion programs consistent with the "going out of business," "store closing," "sale on everything," "everything must go," or similar theme (including, without limitation, by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers), in a manner consistent with the Approval Order and the Sale Guidelines.

(e) to transfer Merchandise between and among the Stores;

(f) to utilize Merchant's website during the Sale Term to sell Merchandise; provided however, that in the case of Agent's use of Merchant's website to sell Merchandise (as distinct from using Merchant's website for Sale promotional purposes pursuant to subsection (b) above), Agent shall pay as an additional "Expense" all costs and expenses associated with maintaining the website and fulfilling web-based customer orders; and

(g) to conduct the Sale in accordance with the provisions of the Approval Order and Sale Guidelines.

8.2 Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash or nationally recognized bank credit cards.  Except as to coupons related to Merchant's Membership Program as provided for in Section 8.6(b) below, Agent shall not accept or honor any coupons during the Sale Term.

8.3 Sales Taxes.

(a) During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale. All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Merchant shall indemnify and hold harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file

with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)  Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4  <u>Supplies</u>.  Agent shall have the right to use, without charge, all existing supplies located at the Stores including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "<u>Supplies</u>").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse Merchant at Merchant's cost therefor as an Expense.

8.5  <u>Returns of Merchandise</u>.  Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("<u>Returned Merchandise</u>"), <u>provided</u> that such return is in compliance with Merchant's return policy in effect as of the date such item was purchased.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its otherwise "Cost Value," multiplied by the inverse of the then prevailing Sale discount.  The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5).  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during the Weekly Sale Reconciliation.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of Merchandise, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6  <u>Gift Certificates; Membership Program</u>.
(a)  During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar Merchandise credits issued by Merchant prior to the Sale Term (collectively, the "<u>Gift Certificates</u>"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation.  Agent shall not sell any Gift Certificates.

(b)  Merchant shall reimburse Agent in cash for the value of any discounts afforded customers in connection with the use during the Sale Term of Merchant's coupons and/or Merchant's other Membership program benefits ("<u>Membership Program</u>").

8.7  <u>Sale Reconciliation</u>.  On each Wednesday during the Sale Term, Agent and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, and Sharing Amounts, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (<u>i.e.</u> Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "<u>Weekly Sale Reconciliation</u>").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and

Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of Merchant and Agent as a final settlement of accounts between Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.  The parties shall attempt, in good faith, to resolve any dispute arising under this Agreement, including without limitation any dispute relating to one or more Weekly Sale Reconciliation or the Final Reconciliation.  Absent an agreement between the parties, such disputes shall be resolved by the Bankruptcy Court.

8.8 Force Majeure.  If any casualty, act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's discretion, be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender in the event Merchant fails to do so) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9 Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

Section 9.  Employee Matters.

9.1 Merchant's Employees.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any Retained Employee during the Sale Term without Agent's prior consent.

9.2 <u>Termination of Employees</u>.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto, so that Merchant may coordinate the termination of such employee; <u>provided</u>, <u>however</u>, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; <u>provided further</u>, <u>however</u>, that Agent shall immediately notify Merchant of the basis for such "cause."  From and after the date of this Agreement and until the Sale Termination Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" without Agent's prior consent.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee.  With respect to the 5-day notice provisions provided for above in this Section 9.2, Agent shall cooperate with Merchant to provide more than 5 days' prior notice if commercially reasonable circumstances permit (it being understood that Agent shall not be obligated to provide such additional notice).

9.3 <u>Payroll Matters</u>.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4 <u>Employee Retention Bonuses</u>.  Agent may pay, as an Expense, retention bonuses ("<u>Retention Bonuses</u>") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), up to a maximum of ten percent (10%) of base payroll for all Retained Employees, to such Retained Employees who do not voluntarily leave employment and are not terminated "for cause," as Agent may determine in its discretion.  The amount of such Retention Bonuses shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.<u>Conditions Precedent and Subsequent</u>.  The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the applicable party:

(a)  All representations and warranties of Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(b)  Merchant shall have obtained, on or before March 3, 2011, entry of the Approval Order.

(c)  Lender shall have consented to the transactions contemplated under this Agreement by its execution of the signature page hereof.

Section 11.<u>Representations, Warranties and Covenants</u>.

11.1    <u>Merchant's Representations, Warranties and Covenants</u>.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)  Merchant (i) is a corporation or a limited liability company duly organized, validly existing and in good standing under the laws of the State of its incorporation; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)  Subject to Bankruptcy Court approval, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and except for Bankruptcy Court approval, no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Each of the Agency Documents has been duly executed and delivered by Merchant and subject to Bankruptcy Court approval constitutes the legal, valid and binding obligation of Merchant enforceable in accordance with its terms.

(c)  Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all liens, claims and encumbrances of any nature except for liens held by Lender, and any other lien arising under applicable non-bankruptcy law, including liens for unpaid taxes and amounts owing the landlords (collectively, "Permitted Liens"); provided however that pursuant to the Approval Order all such Permitted Liens shall attach only to the Guaranteed Amount, the Sharing Amount and amounts reimbursed by the Agent to Merchant on account of Expenses.  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)  Merchant has maintained its pricing files (including without limitation the Cost File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale markdowns, as of the dates and for the periods indicated therein.  Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)  Through the Sale Commencement Date, Merchant has, and shall continue to, ticket or mark all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale from the Merchandise prior to the Sale

Commencement Date, and has not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)  Since January 1, 2011, Merchant has not, and through the Sale Commencement Date Merchant shall not, purchase for or transfer to or from the Stores any merchandise or goods outside the ordinary course; and has operated the Stores in all material respects in a manner consistent with Merchant's historic practices.

(g)  To the best of Merchant's knowledge after due inquiry, all Merchandise is in compliance with all applicable federal, provincial, state or local product safety laws, rules and standards. Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)  The Approval Order will confer upon Agent the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary for (i) the conduct of the Sale at the Store.  Absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)  Absent a bona fide dispute, Merchant had paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)  Since January 1, 2011, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)  Except as to the past and anticipated promotions identified on Exhibit 11.1(k), and except further as to Merchant's discontinuation of its ordinary course merchandise replenishment program on or about December 15, 2010, since January 1, 2011, Merchant has, and through the Sale Commencement Date Merchant covenants to continue to, operate the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business and consistent with Merchants other stores; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv)  not making any management personnel moves or changes at the Stores.

(l)  As of the Sale Commencement Date, the mix of Merchandise shall be substantially as set forth on the Cost File.

(m)  To the best of Merchant's knowledge, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

11.2    <u>Agent's Representations, Warranties and Covenants</u>.  Agent hereby represents, warrants and covenants in favor of Merchant as follows:

(a) Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

(b) Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement (other than the Approval Order), and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c) No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

Section 12.    <u>Insurance</u>.

12.1    <u>Merchant's Liability Insurance</u>.  Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Store; and shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.

12.2    <u>Merchant's Casualty Insurance</u>.  Merchant will provide throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount

equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, plus any self insurance amounts and the amount of any deductible or self-insured retention paid by Merchant shall constitute Proceeds hereunder. Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured (as its interest may appear), in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

      12.3   Agent's Insurance.  Agent shall maintain, as an Expense hereunder, throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as additional insureds with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as additional insureds, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).

      12.4   Worker's Compensation Insurance.  Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

    Section 13.Indemnification.

      13.1   Merchant Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise, Merchant Consignment Goods, or Owned FF&E; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); and (vi) the gross negligence (including omissions) or willful misconduct of Merchant, or its officers, directors, employees, agents or representatives (other than Agent or Agent's employees, agents or independent contractors).

      13.2   Agent Indemnification.  Agent shall indemnify and hold Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and

expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of Merchant by Agent or any of its representatives; and (iv) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

Section 14.Defaults.  The following shall constitute "Events of Default" hereunder:

(a)  The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

(b)  Any representation or warranty made by Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party; or

(c)  The Sale is terminated or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

In the Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by the Bankruptcy Court.

Section 15.Miscellaneous.

15.1    Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, or by Federal Express or other recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to the Agent: | LIQUID ASSET PARTNERS LLC |
|  | 4060 - 29th Street |
|  | Grand Rapids, MI 49512 |
|  | Attention: William Melvin III |
|  | Tel: (616) 450-0691 |
|  | Email: bmelvinjr@aol.com |
|  |  |
|  | SOLID ASSET SOLUTIONS LLC |
|  | 540 Frontage Road, #3005 |
|  | Northfield, IL 60093 |
|  | Attention: Stephen Roemer |
|  | Tel: (847) 738-1536 |
|  | Email: steve@solidassetsolutions.com |
|  |  |
| If to the Merchant: | THE RUGGED BEAR COMPANY |
|  | 117 Lenox Street |
|  | Norwood, MA 02062 |
|  | Attention: Michael O'Hara, Chief Restructuring Officer |
|  | Tel: 617-437-6510 |
|  | Email: mohara@consensusadvisors.com |
|  |  |
| If to the Lender: |  |

15.2    Governing Law.  This Agreement shall be governed and construed in accordance with the laws of the Commonwealth of Massachusetts.

15.3    Entire Agreement.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4    Amendments.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5    No Waiver.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

15.7    Execution in Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

15.8    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.9    Wiring of Funds.  All amounts required to be paid by Agent or Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

Section 16.    Security Interest.  Upon issuance of the Letter of Credit, and payment of the Initial Guaranty Payment, and effective as of the Payment Date, Merchant hereby grants to Agent pursuant to Bankruptcy Code § 364(d) a first priority security interest in and lien upon (i) the Merchandise; (ii) the Proceeds (including but not limited to the Agent's Fee and any Sharing Amounts due to the Agent hereunder); (iii) the Initial Guaranty Payment; (iv) the Agent's commission regarding the sale or other disposition of Merchant Consignment Goods under Section 5.4 hereof and (v) the Agent's commission

regarding the sale or other disposition of Owned FF&E to secure the full payment and performance of all obligations of Merchant to Agent hereunder; provided however, that until the payment of the Guaranteed Amount, Expenses and any Sharing Amounts due to Merchant hereunder, in full, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interest of Lender but solely to the extent of the unpaid portion of the Guaranteed Amount, Expenses and solely to the extent consistent with the priorities set forth in Section 3.2(a) hereof, the Sharing Amounts due to Merchant hereunder (if any).  Upon entry of the Approval Order, and payment of the Initial Guaranteed Payment pursuant to Section 3.3 hereof, and the issuance of the Letter of Credit, the security interest granted to Agent hereunder shall be deemed properly perfected without the need for further filings or documentation.

IN WITNESS WHEREOF, the Agent and Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**The Rugged Bear Company and its affiliated debtors and debtors-in-possession**

By:_____
Name:
Its:

**Liquid Asset Partners LLC**

By:_____
Name:
Title:

**Solid Asset Solutions LLC**

By:_____
Name:
Title:

**TD Bank, N.A.**
**Acknowledged as to this Agreement; and Agreed as to Sections 3.3, 8.8, 16, and 17 of this Agreement**

By: _____
Name:
Its:

List of Exhibits:
Exhibit 1 – Store List.
Exhibit 2 – Sale Guidelines.
Exhibit 3.1(b) – Stepdown Schedule (Level).
Exhibit 3.1(c) – Stepdown Schedule (Cost Factor).
Exhibit 3.3 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.2(b) – DC/On Order Merchandise Summary.
Exhibit 11.1(k) – Certain Disclosures.